IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HOWARD C. KIBURZ,** | : | |
| Plaintiff | : | Civil Action No. 1:04-CV-2247 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| **GORDON R. ENGLAND, Secretary,** | : | |
| **United States Department of the Navy,** | : | |
| Defendant | : | |

**MEMORANDUM**

Plaintiff Howard Kiburz brought this action under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, alleging that his former employer, the United States Department of the Navy ("Navy"), discriminated against him on the basis of his disability—severe arthritis in the back and spine. Kiburz alleges that the Navy failed to provide him with two reasonable accommodations: a request to work from home and a request for a special chair. The Navy argues that his first request was unreasonable because he would not be able to fulfill the essential functions of his job from home. It argues that his second request was actually provided, but that despite the Navy's efforts, Kiburz could not be satisfied. Kiburz also claims that the Navy's alleged failure to accommodate him constituted a constructive discharge.

Before the Court is the Navy's motion for summary judgment. (Doc. No. 38.) The parties have fully briefed the motion. For the reasons that follow, the motion will be granted.

**I.     BACKGROUND**

    **A.     Factual Background**[1]

Before the termination of his employment at the Navy Supply Information Systems Activity, formerly known as the Navy Fleet Material Support Office ("FMSO"), in Mechanicsburg, Pennsylvania, Plaintiff Howard Kiburz worked for the Navy as an Information Technology Specialist. SMF ¶¶ 4-5. In that capacity, Kiburz performed a variety of duties related to relatively complicated computer programming in Information Technology ("IT"). SMF ¶ 19. Specifically, as described in his job description, Kiburz performed the following principal duties: he worked on "complicated IT special projects and/or with significant IT design, modification and/or non-routine maintenance assignments [which involved] responsibility for one or more applications/operations (A/Os) (or their equivalents) which are complicated by extensive/significant interactions with other IT systems/applications/operations"; he provided "technical advice/assistance to customers/sponsor, user representatives, subject-matter experts and IT personnel regarding a wide variety of IT matters"; and he developed "problem resolutions, recommendations or other products related to IT special projects, unique maintenance situations and/or design/modification assignments." R. 196-202; SMF ¶ 21.

Between 1998 and 1999, Kiburz began to miss work frequently due to back pain caused by severe arthritis in his spine. SMF ¶ 27. Kiburz asked his supervisor, Ed Ferguson, for a more flexible work schedule. SMF ¶ 28. Ferguson suggested that Kiburz submit a written request

---

[1] The following facts are not in dispute for the purposes of summary judgment, and are taken from the Defendant's Statement of Material Undisputed Facts ("SMF") (Doc. No. 39), Plaintiff's Response to Defendant's Statement of Alleged Undisputed Material Facts ("RSMF") (Doc. No. 46), and the record before the Court.

with the FMSO for a schedule that would better suit Kiburz.  Id.  In September 1999, Kiburz requested that he be allowed to work a schedule with a starting time window of 6:30 a.m. to 12:00 p.m. and a departing time window of 3:30 p.m. to 8:30 p.m., but with no more than an eight-hour workday.  SMF ¶ 31.  Kiburz also requested that he be permitted to work on weekends, if necessary.  Id.  FMSO approved of Kiburz working a flexible schedule, but not the hours suggested by him; rather, FMSO agreed to permit Kiburz to have start times from 6:30 a.m. to 11 a.m. and stop times between 3:30 p.m. to 7:30 p.m., Mondays through Fridays.  SMF ¶ 33.

As Kiburz's back condition worsened and as he experienced intermittent periods of severe pain, he was only able to work a few days per week.  SMF ¶¶ 38, 39, 41.  As such, Kiburz emailed his new department supervisor, Don Humphrey, about the possibility of disability retirement.  SMF ¶ 40.  He also indicated that he would "be willing to take home a [computer] and give [working at home] a try. . . . [but that] [i]f this work at home doesn't work out successfully then it will need to be documented that there was an inability to make a reasonable accommodation for me."  R. 214.

Kiburz's email was then forward to Starr Lehman, who worked in the Equal Employment Oportunity Office/Workforce Diversity Office and handled reasonable-accommodation requests by employees with medical needs.  SMF ¶¶ 45-46.  Lehman replied to Kiburz, indicating that he would need to complete additional paperwork, including an employee's statement and a physician's statement, in order to make a formal request to work from home.  SMF ¶ 47.

In the meantime, Kiburz's continued to miss work due to his back condition.  Humphrey documented that between June 1999 and July 2000, Kiburz had used 475 hours of annual leave,

3

92 hours of sick leave, and 159.5 hours of leave without pay, with his work attendance record only getting worse. SMF ¶ 51. Humphrey believed that Kiburz's "lack of attendance, although any isolated incident or absence or incidents of absences in total do not represent unsatisfactory work performance (read that his current workload is low and he is just making required delivery dates), has caused problems." SMF ¶ 63; R. 216.

### 1.   Work-from-home Request

In July 2000, Kiburz submitted to Lehman his first proposed accommodation—to be permitted to work from home—pursuant to the Navy's Flexiplace program.[2] SMF ¶ 59. Attached to the proposal were documents from Kiburz's doctor, Dr. MacKellar, informing Lehman of the severity of Kiburz's condition and that it required almost complete immobility for pain control. SMF ¶¶ 66-69. Dr. MacKellar stated that the frequency and length of the episodes was extremely variable and unpredictable, and that Kiburz's condition would likely worsen over time. Id. Based on these submissions, and reasoning that Kiburz would be unable to perform his duties even if he were permitted to work from home, the Workforce Diversity Office denied his proposed request. SMF ¶¶ 72-73.

On January 31, 2001, Kiburz again requested permission to work from home. SMF ¶ 87. Kiburz again attached a letter from Dr. MacKellar informing Lehman of the state of Kiburz's back condition. SMF ¶¶ 87-89. The Workforce Diversity Office again denied the request to

---

[2] Flexiplace is a program designed to allow employees with medical needs the opportunity to perform their duties for a specific period of time at work sites other than the official duty station. Def's Ex. H. In order to qualify for the Flexiplace program, an employee must demonstrate a medical need and be an independent worker free from constant supervision. Supervisors, Project Officers, Team Leaders, Secretaries Administrative Personnel, and Labor Management Partnership Council members were excluded from participation in the Flexiplace program except for short-term medical reasons. Id.

work from home.  SMF ¶¶ 91, 95.  It was determined that Kiburz's request lacked medical documentation indicating that, "as a full-time employee, Mr. Kiburz could successfully perform his duties contributing to FMSO's mission by working at home on an intermittent basis, at his convenience."  RSMF ¶ 92.

### 2. Orthopedic-Chair Request

In addition to his work-from-home request, Kiburz proposed a second accommodation—to obtain a more orthopedic chair for use at work, specifically a chair that was "fairly plush, has a high straight back and most important the high back inclines back so my spine is not in a vertical position."  SMF ¶ 60; R. 225.  On September 19, 2000, Kiburz's chair request was approved.  SMF ¶ 73.

Kiburz was put in touch with Wendy Beecher, the Health and Occupation Specialist, who assisted employees in chair selections.  SMF ¶¶ 74, 99.  Beecher asked Kiburz to submit to her specifications specific to his condition from Kiburz's doctor for a chair that would enable him to work comfortably at his computer.  SMF ¶ 100.  In February 2001, Kiburz submitted to Beecher a recommendation from Dr. MacKellar for an appropriate chair.  Id.  Dr. MacKellar recommended a "high-backed, tilting, executive type chair with significant padding on both back and seat areas with arm rests on each side."  RSMF ¶ 101.

In response to Dr. MacKellar's recommendation, Beecher permitted Kiburz to seek a suitable chair.  SMF ¶¶ 102, 165.  Kiburz's search was to no avail and, subsequently, Beecher attempted to find Kiburz a suitable chair.  SMF ¶ 171.  Beecher's efforts included her performing an ergonomic evaluation of Kiburz's work station, taking Kiburz's doctor's description of an appropriate chair, taking Kiburz's description of the chair, and contacting various venders to try

to find chairs that could accommodate Kiburz. SMF ¶¶ 172, 173. Despite Beecher's efforts, Kiburz did not find a chair to his liking. SMF ¶ 175. Specifically, he found the chairs to be too firm or lacking in their ability to recline. RSMF ¶ 175.

As a last resort, in December 2001, Beecher suggested to upper-level management that an occupational therapist perform a seating evaluation. SMF ¶¶ 176, 177. On March 14, 2002, a seating evaluation of Kiburz was conducted, but the therapist concluded that there was nothing she could recommend that would help Kiburz. SMF ¶ 184.

### 3. Termination

Before the seating evaluation had been conducted, on February 6, 2002, Ferguson issued a Notice of Proposed Removal to Kiburz, advising that he intended to propose terminating Kiburz's employment because of the frequent absences and the adverse effects on FMSO's ability to perform its mission. SMF ¶ 180. On May 3, 2002, Kiburz's employment was terminated. SMF ¶ 199.

### 4. Administrative Proceeding

Following Kiburz's removal, he appealed the Navy's decision to the Merit System Protection Board (MSPB), which reviews civil service decisions. Kiburz challenged his removal on two grounds: first, that his termination violated the merit system's rule governing federal employees; and, second, that his removal constituted disability discrimination under the Rehabilitation Act. SMF ¶¶ 200-202. The MSPB concluded that the removal was improper because Kiburz's absences had not continued for a "reasonable time" after being warned that adverse action might be taken due to his usage of leave time. SMF ¶ 209. Accordingly, the MSPB ordered the Navy to reinstate Kiburz and awarded him back pay and benefits retroactive

to May 3, 2002. Id. With respect to Kiburz's Rehabilitation Act claim, however, the MSPB denied the claim, holding that Kiburz was not a "qualified disabled person" because Kiburz could not perform the essential functions of his job with or without a reasonable accommodation. SMF ¶¶ 210, 211. On appeal, the full MSPB affirmed the decision in its entirety.

Kiburz returned to work in November 2002 under the supervision of Larry Greenawalt. SMF ¶ 214. Upon his return, Kiburz renewed his request for a new chair because the chair that been given to him was breaking. RSMF ¶ 217. Greenawalt took several measures to provide Kiburz with a reasonable chair, including providing him with information about Big and Tall chairs and offering to drive Kiburz to local stores on government time. SMF ¶ 219. In the meantime, Kiburz emailed Beecher about using a Zero Gravity chair in the office, but Beecher indicated that she was not sure how that chair could be used in an computer-driven environment. SMF ¶¶ 220, 221.

Later, Kiburz was provided with a new chair that he could use for a trial period, and that chair was replaced with one that Kiburz had handpicked from the Big and Tall catalog. SMF ¶¶ 222, 223.

Shortly thereafter, Kiburz was offered a Voluntary Separation Incentive Payment program. Kiburz applied for voluntary retirement, and on July 1, 2003, he retired and received $25,000 in bi-weekly payments.

### B.     Procedural Background

Kiburz brought two claims against the Navy under the Rehabilitation Act: disability discrimination in the form of failure to accommodate and constructive discharge for failing to

accommodate Plaintiff's disability. After the Navy filed an answer to the complaint (Doc. No. 9), the parties unsuccessfully attempted to resolve the dispute through mediation.

The Navy then filed a motion for partial summary judgment on the grounds that Kiburz failed to exhaust his constructive discharge claim (Doc. No. 17), and the motion was denied (Doc. No. 25). In particular, the Court held that under the test articulated in Waiters v. Parsons, 729 F.2d 233, 238 (3d Cir. 1984), because the core grievance—failure to accommodate—was the same for both of his claims, he was not required to exhaust his constructive discharge claim. Following additional discovery, the Navy filed the instant motion for summary judgment (Doc. No. 38), and the parties briefed the motion (Doc. Nos. 39, 40, 45, 46, 47, 50, 51).

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Public Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, it essentially becomes "'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotations omitted). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the nonmoving party must provide, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### III. DISCUSSION

#### A. General Principles

The Rehabilitation Act ("the Act"), 29 U.S.C. § 701 *et seq.*, "forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The Third Circuit has held that under the

Act, "employers have legitimate interests in performing the duties of their business adequately and efficiently [and therefore] [e]mployers cannot be obligated to employ persons who are incapable of performing the necessary duties of the job." Shirling v. Runyon, 90 F.3d 827, 830-31 (3d Cir. 1996).

Claims of discrimination under the Rehabilitation Act are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793-94 (1973). Under the McDonnell Douglas framework, a plaintiff has the burden to establish a prima facie showing of discrimination. If the plaintiff can establish a prima face case, the burden shifts the employer to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. If the employer advances such a reason, the burden shifts back to the plaintiff to show that the proffered reason is pretextual.

To establish a prima facie case under the Act, an employee has the initial burden of showing that: (1) he has a disability; (2) he is "otherwise qualified to perform the essential functions of the job, with or without a reasonable accommodation by the employer"; and (3) he suffered an adverse employment action. Shirling, 90 F.3d at 831.

Kiburz alleges two separate charges of discrimination. First, he alleges that the Navy discriminated against him when it terminated his employment in May 2002 without providing him with reasonable accommodations. Second, he alleges that, when he accepted voluntary retirement, he was constructively discharged by the Navy's alleged failure to accommodate him. The Court will address each charge in turn.

### B. Kiburz's Accommodation Claims

Kiburz's first claim is that the Navy discriminated against him when it terminated his employment in May 2002. It is not in dispute for the purposes of this motion that Kiburz can show that he is disabled and that his termination constituted an adverse employment action. The Navy argues, however, that Kiburz was not qualified to perform the essential functions of the job with a reasonable accommodation, and therefore cannot satisfy the second element of his prima facie case. In response, Kiburz argues that he could fulfill the duties of his job with either of two reasonable accommodations: his work-from-home request and his orthopedic chair request.

#### 1. Work-from-home request

Kiburz suggests that the first reasonable accommodation would have been to allow him to work from home on those days when his arthritis pain prevented him from going to work. He claims that this accommodation would be reasonable because his presence at the job site was not an essential function of his job. (Pl's Br. in Opp'n 5.) Specifically, Kiburz contends that as a Computer Specialist and Information Technology Specialist, he corresponded with others mainly by phone or email. Moreover, he claims that his job only occasionally required him to meet face-to-face with others and that, even during these occasional face-to-face encounters, the meetings could have been conducted via email. Id.

Kiburz relies on guidelines promulgated by the Equal Employment Opportunity Commission to help employers and employees determine whether working from home is a reasonable accommodation. Specifically, the EEOC guidelines provide that disabilities that cause unpredictable "flare-ups" do not foreclose the possibility of a work-from-home accommodation. Instead, such flare-ups may require that an employee be allowed work from

home on an "as needed" basis, provided that such an arrangement does not cause the employer undue hardship. (Pl's Ex. I.)

The Navy counters that because Kiburz was a senior analyst with "team leader" functions, and was responsible for guiding, assisting, and training other analysts, Kiburz's presence at work was an essential function of his job. (Def's Br. in Supp. 13.) The Navy emphasizes that Kiburz's duties required him to "provide guidance and advice, problem solve, and interact with others," which could not be done from home. Id.

According to the Navy, allowing Kiburz to work from home, either occasionally or permanently, would have caused undue hardship with respect to: scheduling meetings and training sessions, assigning projects and computer applications that required intermittent emergent meetings, and predicting workload assignments and their completion dates could not be accurately assessed. (Id. at 14.) Additionally, the Navy asserts that, even if Kiburz were permitted to work from home, there was never any assurance that Kiburz would be able to perform his essential job functions. Indeed, because Kiburz's condition caused episodes of debilitating pain which required almost complete immobility, Kiburz would only be able to perform very little work, if any work at all, even at his home. Id.

In its brief, the Navy "maintains that in any company or any branch of the government, it is per se unreasonable for key employees who are expected to provide guidance and advice, problem solve, and interact with others, as was the case with Kiburz, to work from home." (Def's Br. in Supp. 13.) Though the circuits do not treat work-from-home requests uniformly,[3]

---

[3] Compare, e.g., Vande Zande v. Wisc. Dept. of Admin., 44 F.3d 538, 544 (7th Cir. 1995) (adopting a presumption against working from home except in "extraordinary circumstances") with Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1136-37 & 1136 n.15 (9th Cir. 2001)

the Court declines to adopt such a per se rule. Cf. Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198 (2001) (stating that, under the Americans with Disabilities Act, a court must evaluate the existence of a disability "on a case-by-case basis."). Rather, the Court finds that there is no genuine issue of material fact that the requested accommodation to work at home as needed was not reasonable in Kiburz's case and that, even if it were, Kiburz has failed to meet his burden to show that he could perform the essential functions of the job with the accommodation.

The Navy contends that, as an Information Technology Specialist, Kiburz's physical presence in the office was one of the essential functions of his job. First, the Navy argues that Kiburz needed to be physically present to work with other employees, users, and clients. While the parties engage in a semantic dispute about whether Kiburz was a "team leader,"[4] there is no dispute that his supervisors expected him to, among other things, "work[] with others . . . and attend meetings -- sometimes numerous meetings and, with some regularity, unplanned meetings -- with various persons such as users, team members, other IT staff, and supervisors -- to plan and carry out the IT work, resolve problems, allocate resources, and deal with many issues

---

(finding "no reason not to follow the approach taken by the EEOC in its Enforcement Guidance," which is that "[w]orking at home is a reasonable accommodation when the essential functions of the position can be performed at home and a work-at-home arrangement would not cause undue hardship for the employer."). See also Brianne M. Sullenger, Comment, Telecommuting: A Reasonable Accommodation under the Americans with Disabilities Act as technology advances, 19 Regent U. L. Rev. 537 (2006-2007) (identifying a "presumption-against-telecommuting approach" and a "fact-specific approach," and advocating for the latter).

[4] Compare SMF ¶ 26 ("Kiburz was a Team Leader, Ferguson and upper management viewed Kiburz as a Team Leader, and in Ferguson's opinion, Kiburz acted as a Team Leader within the section -- at least when he (Kiburz)was present; further, at no point did Kiburz inform Ferguson or anyone else in management that he was not, or did not view himself as, a Team Leader.") with RSMF ¶ 26 ("It is admitted that Mr. Ferguson told Mr. Kiburz that Mr. Kiburz was a 'team leader'. At that time Mr. Kiburz was not familiar with OPM's 'Guide". Therefore, Mr. Kiburz did not challenge the designation.").

arising in the field of IT." (Ferguson Decl. ¶ 19.)  Second, the Navy contends that working at home on an irregular basis would not be consistent with his essential functions because "such a schedule -- with us never knowing when Kiburz would be able to work and when he would not, would prevent [Kiburz's supervisors] . . . from assigning Kiburz to work on other applications/projects/assignments that required meetings (some unscheduled), dealing with problems on a emergent basis, and providing guidance and advice to other staff and managers." (Id. ¶ 71.)  Finally, the Navy indicates that working from home limited its ability to schedule training sessions for Kiburz, thereby reducing his ability to "transition[] Kiburz to new technology."  (Id. ¶ 73.)

   Kiburz disagrees with the Navy's view, and posits that he could have performed the vast majority of his duties from home.  In particular, he claims that "[w]hile my position is an important one, it is not a 'key' position in the sense that if I am not at work, nobody else can do their job," (Kiburz Aff. ¶ 5), and that the Navy overstates the role that meetings played in his job duties, (id. at ¶¶ 6-8).  Even if true, Kiburz does not address those other duties—training, scheduling, and guidance—that the Navy expected him to fulfill as part of his job.  With regard to those essential functions, Kiburz presents no reason to believe that he could perform those duties if he were to work-from-home on an irregular basis.  Cf. Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1124 (10th Cir. 2004) ("[A] request to work at home is unreasonable if it eliminates an essential function of the job."); see also Humphrey v. Memorial Hosp. Ass'n, 239 F.3d 1128, 1136 (9th Cir. 2001) (holding that there was "at least a triable issue of fact as to whether [the plaintiff] would have been able to perform the essential duties of her job with the accommodation of a work-at-home position" where "physical attendance at the [employer's]

offices [was] not an essential job duty.") In this case, where there is no genuine issue of material fact that Kiburz could not perform all of the essential functions of his job without his regular, physical presence in the workplace, his work-from-home request was not a reasonable accommodation.

Moreover, Kiburz by his own admission acknowledged that he "*might* be able to do some of my estimating, analyzing, programming and program release duties from home [but that] there would also be days when [he] couldn't even perform [his] duties from home because of the arthritis." SMF ¶ 88 (emphasis added). As such, even if the accommodation had been reasonable, the record suggests that Kiburz could not demonstrate that he was "otherwise qualified to perform the essential functions of the job."

Accordingly, summary judgment is appropriate on Kiburz's disability discrimination claim based on the Navy's denial of his work-from-home accommodation request.

**2.      Kiburz's Chair Request**

With respect to Kiburz's other accommodation request—to be provided with a chair that would assist him to work at the office—it is not in dispute that such an accommodation would, in the ordinary course, be reasonable. The Navy even attempted to provide Kiburz with an appropriate chair on several occasions. Nonetheless, Kiburz contends that the Navy discriminated against him by failing to provide him with an appropriate chair and delaying in its efforts.

The record does not support Kiburz's view. The record reflects the great lengths to which the Navy went to accommodate Kiburz—including search attempts by multiple Navy employees, an ergonomic evaluation, and providing with numerous Kiburz chairs. Time after time, Kiburz

was dissatisfied with the chairs that the Navy supplied for various reasons (e.g., "too firm"). The undisputed facts establish that the Navy attempt "to accommodate his request, but . . . it was impossible to do what Kiburz wanted in a way that satisfied Kiburz . . . ." (Def's Br. in Supp. 16.) Though Kiburz may have privately preferred a *quicker* resolution, there is no indication in the record that he made his concerns known or that the Navy delayed in its attempt to accommodate him.

Kiburz has failed to identify any evidence of record that suggests that the attempts by the Navy to accommodate him, albeit unsuccessful, were not reasonable. Accordingly, the Navy is entitled to summary judgment on Kiburz's claim that the Navy violated the Rehabilitation Act by failing to provide him a suitable chair.

      **C.**    **Constructive Discharge**

Finally, Kiburz asserts that he was constructively discharged by the Navy. Specifically, Kiburz contends that after he was reinstated in November 2002, the Navy's failure to make reasonable accommodations resulted in a hostile work environment, which, in turn, caused Kiburz to miss more work. (Pl's Br. in Opp'n 23.)

To prevail on a constructive discharge claim, a plaintiff must establish that the employer knowingly permitted conditions of discrimination so intolerable that a reasonable person would have felt compelled to resign. Spangle v. Valley Forge Sewer Auth., 839 F.2d 171, 173 (3d Cir. 1988) (citing Goss v. Exxon Office Sys Co., 747 F.2d 885, 888 (3d Cir. 1984)). Stated differently, a plaintiff must show that the conditions of discrimination passed "a threshold of intolerable conditions." Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 169 (3d. Cir. 2001). As the Third Circuit has stated "employees are not guaranteed stress-free environments and that

discrimination laws 'cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.'" Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998) (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992)).

Here, there is no evidence of intolerable conditions sufficient to constitute a constructive discharge. Initially, it is not in dispute that Kiburz never advised his supervisors that, upon his return, he was dissatisfied with the Navy's accommodations. SMF ¶¶ 226-227. Moreover, on his retirement, Kiburz signed a statement indicating that he was retiring voluntarily. SMF ¶ 231. Finally, Kiburz's only argument with respect to constructive discharge is that a jury could conclude that "[l]ooking at the prospect of continuing to work without reasonable accommodation, it was reasonable for him to quit his job and take advantage of the early retirement incentive." (Pl's Br. in Opp'n 28.) However, even if it was reasonable to quit, there is no evidence of "unendurable working conditions" that is required to succeed on a constructive discharge. Thus, Kiburz cannot succeed on his constructive discharge claim.

## IV.    CONCLUSION

Accordingly, the Navy's motion for summary judgment will be granted. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HOWARD C. KIBURZ, | : | |
|     Plaintiff | : | Civil Action No. 1:04-CV-2247 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| GORDON R. ENGLAND, Secretary, | : | |
| United States Department of the Navy, | : | |
|     Defendant | : | |

## ORDER

**AND NOW**, on this 13th day of July, 2008, for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT** Defendant's motion for summary judgment (Doc. No. 38) is **GRANTED**. The Clerk is directed to enter judgment in Defendant's favor.

                                                s/ Yvette Kane
                                                Yvette Kane, Chief Judge
                                                United States District Court
                                                Middle District of Pennsylvania